UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DOLDO BROTHERS, INC.
a New York corporation; and
FINGER LAKES BOTTLING CO., INC.
a New York corporation,

                                                Plaintiffs,

   -against-                                             7:08-CV-206

COORS BREWING COMPANY
a Colorado company,

                                                Defendant.
_____

THOMAS J. McAVOY,
Senior United States District Judge

**DECISION & ORDER**

**I.    INTRODUCTION**

      Plaintiffs commenced this action on February 22, 2008 pursuant to the Court's diversity jurisdiction seeking (a) a declaration that Defendant's stated intention to terminate Plaintiffs' distributor agreements for the exclusive territorial distribution of Molson beer violates New York Alcohol Beverage Control Law § 55-c ("ABC Law § 55-c "), and (b) a permanent injunction preventing termination of those agreements. See Compl., dkt. # 1. On February 25, 2008, Plaintiffs moved by way of application for an order to show cause for a preliminary injunction preventing termination of the agreements until further proceedings could be conducted under the provisions of ABC Law § 55-c. See

1

Motion, dkt,. # 6. The Court granted the application for an order to show cause, ordered Defendant to respond by February 28, 2008, and set the matter down for a hearing on March 5, 2008. See 2/25/08 Order to Show Cause, dkt. # 7. Defendant responded by opposing the motion for a preliminary injunction and by making a cross-motion to: (a) deposit $ 1,291,000 into the Court pursuant to Fed. R. Civ. P. 67(a) as "reasonable compensation" for the Molson distribution rights of the 2 plaintiffs; and (b) stay litigation pending arbitration. See Def. Opp. and Cross-Motion, dkts. # 10 - # 11. Plaintiffs filed papers in opposition to the cross-motion on February 4, 2008, and the Court conducted a hearing on the motions on February 5, 2008.

## II.    BACKGROUND[1]

### a.    Parties

Doldo Brothers, Inc. ("Doldo Brothers") is a licensed, multi-brand distributor of alcoholic and non-alcoholic beverages with its principal place of business in Watertown, New York. It has been the exclusive distributor of Molson in Jefferson and Lewis counties for 17 years. Finger Lakes Bottling Co., Inc. ("Finger Lakes") is a licensed, multi-brand distributor of alcoholic and non-alcoholic beverages with its principal place of business in Auburn, New York. It has been the exclusive distributor of Molson in Cayuga, Seneca, Ontario, Wayne, and Yeats counties for 16 years, and in Oswego County for 11 years. Coors Brewing Company ("Coors") is a Delaware corporation with its principal place of business in Colorado.

---

[1] Much of the background in this case is not disputed and is taken from the parties' submissions.

### b.      Agreements/Relationship of the Parties

In the mid-1990s, both Plaintiffs signed written distribution agreements with Martlet Importing Co, Inc. ("Martlet"), a former imported of Molson beer into the United States. In the late 1990s, Martlet's importing rights of Molson beer were assigned to a joint venture between Miller Brewing Company ("Miller") and Molson Canada. Plaintiffs both contend that their primary domestic beer is, and was at the time of the joint venture, Miller brand beer. Miller did not require Plaintiffs to sign written distribution agreements.

Molson Canada's relationship with Miller ended in 2000 and a joint venture between Molson Inc. and Coors was formed - Molson 2000 LLC - for the sole purpose of distributing Molson beer in the United States. In January 2001, Coors assumed sales and distribution responsibilities of this new joint venture. At that time, Molson 2000 LLC, which later changed its name to Molson USA LLC ("Molson USA"), requested Plaintiffs and the other New York Molson beer distributors to execute a document entitled the "Molson Amendment." In January 2001, both Plaintiffs executed the Molson Amendment. See Vasile Aff. ¶ 10 & Ex. B; Doldo Aff. ¶ 10 & Ex. B.

The Molson Amendment provides in pertinent part:

Any and all disputes between Distributor and the Company or its agent, Coors, except nonpayment of Distributor's account, including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, which disputes are not resolved by Mediation, shall be submitted to binding arbitration in the city nearest to Distributor in which there is a regional office of the American Arbitration Association, before a single arbitrator, in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association.

Molson Amendment ¶ 6.2.

In early 2001, Molson USA formulated and began to implement what it termed a

policy of consolidation. Plaintiffs contend that the plan was "simply a marketing plan to align the Molson distributor network with the Coors distributor network." Plf. Mem L. p. 6. In late 2002, Molson USA contacted both Plaintiffs and purportedly told them that the plan was to align distribution channels with Coors distributors. Id.  Molson USA proffered new distributor agreements, entitled "Molson Distributorship Agreement" (the "Molson Agreement"), to both Plaintiffs. Doldo Brothers signed the Molson Agreement, see Doldo Aff. ¶ 11 & Ex. C, Finger Lakes did not. The Molson Agreement has a binding arbitration provision with language identical to that found at paragraph 6.2 of the Molson Amendment. See Molson Agreement, ¶ 11.2.

Plaintiffs contend that, throughout 2003, their attorney disputed Molson USA's right to consolidate Molson beer distribution in New York. On Feb. 9, 2005, the parent companies of Coors and Molson merged, resulting the formation of the Molson Coors Brewing Company ("Molson Coors"). Plaintiffs contend that Molson USA "continued its operation as a wholly owned subsidiary of Molson Coors, and continued its efforts to align its distribution network." Plf. Mem. L. p. 6.

> On March 11, 2005, Molson USA contacted both plaintiffs and reiterated that it adopted a nationwide "policy of consolidation" in 2002. Thereafter, on August 4, 2005, Molson USA advised Plaintiffs that Molson USA commenced an arbitration against another New York State wholesaler, John G. Ryan, Inc. (the "Ryan Arbitration"), to obtain a declaration that it was entitled pursuant to [ABCL] §55-c to terminated the Ryan distributorship pursuant to its consolidation policy.  By this letter, Molson USA advised Plaintiffs that if successful, "Molson USA will seek declarations permitting the termination of its agreement with Plaintiffs." On September 19, 2007, as a result of the decision in the Ryan Arbitration, Molson USA advised Plaintiffs it was going to be "commencing an action against [Plaintiffs] in order to accomplish the consolidation of the Molson brands with the Coors network consistent with New York Consolidation Statutes Section 55-c."

Plf. Mem. L. p. 7.

By letter dated December 7, 2007, Coors announced to Plaintiffs that, as of December 2, 2007, Coors became, by assignment, the successor to Molson USA as the supplier of Molson brands. Id.  By this letter, Coors further announced that "[p]ursuant to Section 55-c of the New York Alcoholic Beverage Control Law . . . Coors has elected to terminate the distribution agreement for the Molson Brands with your company as part of its nationwide policy of consolidation for the Molson Brands . . . effective March 15, 2008." Id.  Coors offered to pay Plaintiffs 2.9 times their gross profit on the sale of the Molson brands as compensation for the loss of the right to distribute Molson brands in their respective territories.  The "2.9 times gross profit on the sale of the Molson brands" figure was the amount that the arbitrator in the Ryan Arbitration ultimately determined was appropriate compensation under the provisions of ABC Law § 55-c.

### c.    Plaintiffs' Arguments under the N.Y. Alcoholic Beverage Control Law

New York ABC Law § 55-c concerns agreements between brewers[2] and beer wholesalers. See generally NY ABC L § 55-c.  As to terminations of distribution agreements, § 55-c(4)(a) provides that "[n]o brewer may cancel, fail to renew, or terminate an agreement unless the party intending such action has good cause for such cancellation [and] the party intending to act has furnished [90 day] prior notification. . . ."  NY ABC L § 55-c(4)(a).  Section 55-c(2)(e)(i)(A) defines "good cause" to mean "[t]he implementation by a brewer of a national or regional policy of consolidation which is reasonable,

---

[2] Section 55-c(2)(b) defines a "Brewer" to be:

any person or entity engaged primarily in business as a brewer, manufacturer of alcoholic beverages, importer, marketer, broker or agent of any of the foregoing who sells or offers to sell beer to a beer wholesaler in this state <u>or any successor to a brewer</u>.

NY ABC L 55-c(2)(b) (emphasis added).

5

nondiscriminatory and essential." NY ABC L 55-c(2)(e)(i)(A). The subsection further delineates what a brewer must do in announcing and implementing a policy of consolidation. Id.[3]

Section 55-c(6) allows for a civil action "in a court of competent jurisdiction . . . for damages sustained in accordance with the laws of this state which shall govern all disputes arising under an agreement or by reason of its making and performance." NY ABC L § 55-c(6).

> In any such action the court may grant such equitable relief as is necessary or appropriate, considering the purposes of this section, to remedy the effects of any failure to comply with the provisions of this section or the effects of conduct prohibited hereunder, including declaratory judgment, mandatory or prohibitive injunctive relief, or preliminary or other interim equitable relief; provided, however, that permanent injunctive relief shall not be granted to prohibit the effectiveness of a termination or non-renewal of an agreement in furtherance of a policy of consolidation that is in compliance with subparagraph (i) of paragraph (e) of subdivision two of this section.

Id. In such actions, "the brewer shall have the burden of proof that its action was based upon good cause, provided however, the wholesaler shall retain the burden of proof in all other respects." Id.

---

[3] In this regard, the subsection provides:

Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. All affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of such policy, and such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

NY ABC L § 55-c(2)(e)(i)(A).

Section 55-c(7)(a) provides that when a brewer implements a national or regional consolidation policy, it "shall not terminate its relationship with an affected wholesaler until compensation as provided for in this subdivision has been paid." NY ABC L § 55-c(7)(a). Such compensation is further defined as "the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of such policy, together with fair and reasonable compensation for other damages sustained." Id. Section 55-c(2)(i) defines "fair market value of distribution rights" as "the amount a willing seller, under no compulsion to sell, would be willing to accept and a willing buyer, under no compulsion to purchase, would be willing to pay for the distribution rights." NY ABC L § 55-c(2)(i).

Subsection 7(c) provides that, "[i]n the event that the brewer and the beer wholesaler are unable to agree on the compensation to be paid for the value of the beer wholesaler's business and assets, the matter may with the consent of both the brewer and the beer wholesaler, be submitted to a neutral arbitrator to be selected by the parties; if they cannot agree on such an arbitrator, the same shall be selected by a judge of a court of competent jurisdiction." NY ABC L 55-c(7)(c). The same subsection also provides that "[n]o brewer or beer wholesaler may impose binding arbitration of any issue as a term or condition of an agreement." Id.

Plaintiffs contend that the December 7, 2007 letter "was the first time Plaintiffs learned that Coors (as opposed to its predecessor) had allegedly adopted a policy of consolidation." Plf. Mem L. p. 7. They argue that Coors has not established good cause to terminate the distributor agreements in issue because *it* has not announced or implemented a national or regional policy of consolidation which is "reasonable, nondiscriminatory and essential" within the meaning of ABC Law § 55-c(2)(e)(i)(A).

Plaintiffs further argue that Coors has not met the other prerequisites of termination under ABC Law § 55-c, including paying reasonable compensation. Finally, Plaintiff contend that ABC Law § 55-c(7)(c) prevents arbitration of the underlying disputes despite the clause for binding arbitration in both distribution agreements.

Defendant has opposed the application for a preliminary injunction and has cross-moved to stay the instant proceedings pending arbitration and to deposit funds into the Court in an amount which Defendant believes will be the ultimate compensation due Plaintiffs under ABC Law § 55-c.

## III.    DISCUSSION

### a.    Right to Seek Preliminary Injunction

Although Defendant has moved to stay the instant proceedings pending arbitration (discussed *infra*), there is no dispute that the subject agreements allow the parties to seek preliminary injunctive relief prior to arbitration. Hence, the motion for a preliminary injunction must be addressed regardless of the outcome of Defendant's cross-motion.

### b.    Preliminary Injunction Standard

Plaintiffs acknowledge that the traditional test for a preliminary injunction requires the movant to establish (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in favor of the plaintiff. Plf. Mem L. p. 7 (citing Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101 (2d Cir. 2003)). However, Plaintiffs point to ABC Law §55-c(6) and argue that the traditional test is not applicable and that it need prove only a

violation of the statute, *and not* irreparable harm, in order to prevail.[4]  The Court does not agree.

Some New York statutes, such as N.Y. Agriculture and Markets Law § 258-e(1) and  N.Y. Education Law § 6824, explicitly allow injunctions "without [the movant] being compelled to allege or prove that an adequate remedy at law does not exist" and, thus, without proof of irreparable harm in the absence of an injunction. See Wickham v. Champlain Creameries, Inc., 245 N.Y.S.2d 688, 696 (N.Y. Sup. Ct. 1963)("[L]ack of an adequate remedy at law need not be alleged or proven in an action for an injunction under Section 258-e of the Agriculture and Markets Law, by the express provisions of that section. Accordingly, plaintiff is not required to allege or prove irreparable damage in order to sustain this action for an injunction.").  New York ABC Law § 55-c does not have such a provision.  Certainly, the New York Legislature knows how to include such a provision in a statute if it desires it.  By the absence of such a provision in ABC Law § 55-c, the Court

---

[4] Plaintiffs argue:

While §55-c recognizes this fundamental test, the Statute provides an alternate and superseding ground for the granting of equitable relief, including mandatory or prohibitive injunction.  Specifically, §55-c(6), which grants wholesalers a private right of action, provides, in pertinent part:

> In any such action, the court may grant such equitable relief as is necessary
> or appropriate, considering the purposes of this section, to remedy the
> effects of any failure to comply with the provisions of this section or the
> effects of conduct prohibited hereunder, including declaratory judgment,
> mandatory or prohibitive injunctive relief or preliminary or other interim
> equitable relief. . . . (Emphasis added).

Section 55-c(6) also provides that "the rights and remedies" available to a beer wholesaler provided in the section "shall be intended to supplement and not be exclusive of any rights and remedies otherwise available pursuant to any other statute, or at law or equity."  Id. (emphasis added).

Plf. Mem. L. p. 8.

9

must conclude that the New York Legislature intended that irreparable harm must be established in order to obtain injunctive relief under ABC Law § 55-c.  Indeed, the New York Appellate Division, Second Department, recently reversed a trial court's order granting a preliminary injunction under ABC Law § 55-c because the plaintiff had failed to establish irreparable harm.  Dana Distributors, Inc. v. Crown Imports, LLC, 2008 WL 458577, at * 1  (2nd  Dept. Feb. 19, 2008).  Thus, Plaintiffs must establish irreparable harm to obtain a preliminary injunction.

    **c.**    **Irreparable Harm**

> "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction . . . .  Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered. . . .  In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." Rodriguez v. DeBuono, 175 F.3d 227, 233 (2d Cir.1999) (internal quotations and citations omitted). The threat of irreparable harm must be actual and imminent, not remote or speculative. Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002).

Hespeler v. Town Of Ledyard, --- F. Supp.2d ----, 2008 WL 542390, at * 3 (D. Conn. Feb. 27, 2008)(Smith, M.J.).

    The Plaintiffs must "demonstrate the likelihood of irreparable harm in the absence of the injunction." Id. at * 4 (citing  MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 192 (2d Cir. 2004)). The alleged irreparable harm must be "incapable of being remedied by monetary damages."  Snecma v. Turbine Engine Components Technologies Corp. --- F. Supp.2d ----, 2008 WL 204619, at * 2 (N.D.N.Y. Jan. 25, 2008)(Hurd, D.J.); see also Dana Distributors, Inc., 2008 WL 458577, at * 1 (It is well settled that "[w]here . . . a litigant can fully be recompensed by a monetary award," there is not irreparable harm."). Plaintiffs, therefore, must establish the likelihood that actual and imminent harm that

10

cannot be compensated momentarily will result from the termination of the distributor agreements on March 15, 2008.

However, Plaintiffs' arguments as to irreparable harm address the economic impact of the loss of the Molson line. Given the sales figures presented by the Plaintiffs in their papers,[5] the Molson line comprises 3-5% of Doldo Brothers' total sales, see, Doldo Aff. ¶ 23, and 10% of total sales and 15% of total gross profits of Finger Lakes. See Vasile Aff. ¶ 21; see also Def. Mem. L. p. 3.[6] Accepting Plaintiffs' figures as accurate, neither presents a scenario of loss that would rise to the level of irreparable harm recognized by previous cases. See Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co., 1986 WL 13950, at *11 (E.D.N.Y. Sep. 9, 1986) (no irreparable harm where sale of beers at issue constituted between 17 and 29 percent of distributor's total sales); Lanvin, Inc. v. Colonia, Inc., 739 F. Supp. 182, 193 (S.D.N.Y. 1990) (loss of 10 percent of gross sales not irreparable harm); Litho Prestige v. News America Pub., Inc., 652 F. Supp. 804, 807

---

[5] Plaintiffs presented no witnesses at the March 5, 2008 hearing. Thus, the factual record for purposes of the preliminary inunction motion is confined to the affidavits submitted in support and in opposition thereto.

[6] Defendant contends:

By Plaintiffs' own admission, the MOLSON® product line is a relatively small percentage of their overall business. To its credit, Plaintiff Doldo is at least candid with the Court in conceding this undeniable fact. See, e.g., Doldo Aff. 23 ("Molson Beer comprises 3-5% of Doldo Brother's [sic] total sales or approximately $500,000 in gross sales.") Doldo does not, however, volunteer its gross profit from the sale of MOLSON® beer. By Coors' calculation, Doldo's gross profit is $125,000 (Styles Decl. 5) - a number that pales in comparison to Doldo's total gross sales of more than $10 million (or more than $16 million if the five percent figure is accurate). Unlike Doldo, Plaintiff Finger Lakes does volunteer its gross profit from the sale of MOLSON® beer. . . . Finger Lakes' statistics (assuming their accuracy) establish that the MOLSON® product line generates no more than 12.84 percent of Finger Lakes' gross profit ($370,000 ÷ $2,881,080) - far less than the percentage that New York courts have repeatedly found to be insufficient to prove irreparable harm under the precedents cited herein.

Def. Mem L. p. 3.

(S.D.N.Y. 1989) (loss of 4 percent of business does not constitute irreparable harm). While Plaintiffs argue in their papers that Finger Lakes will go from a profitable to an unprofitable business, and, therefore, no longer survive, their own figures do not support the argument.  Indeed, at the March 5, 2008 hearing, Plaintiffs' counsel conceded that it is unlikely that either plaintiff will go out of business if the distribution agreements for the Molson line are terminated.

Plaintiffs' argument that they will be irreparably harmed by the loss of "good will" associated with the loss of the Molson line is equally unavailing.  Although the loss of good will can, in certain circumstances, equate with irreparable harm, simply invoking the phrase is insufficient to make the critical finding to support a preliminary injunction.  The cases cited by Plaintiffs do not support the application of the rule here.  In Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2d Cir. 2004), the defendant had taken action that appeared to have been taken by the plaintiff (thereby confusing the plaintiff's customers) and that cast the plaintiff's business in a negative light.  Id. at 397.  No such conduct by Defendant is present here.

In Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438 (2d Cir. 1977), the Second Circuit affirmed the District Court's finding that the loss of the defendant's product line presented "ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages." Id. at 445.  However, a review of the District Court's decision reveals that the loss in question threatened a major impact on the plaintiff's competitiveness. See Jacobson & Co., Inc. v.

Armstrong Cork Co., 416 F. Supp. 564, 569-570 (S.D.N.Y. 1976).[7] For the reasons discussed, including Plaintiffs' figures showing that less than 15% of their sales come from the Molson line and counsel's concession that neither plaintiff will likely be put out of business by the loss, the Jacobson decision does not compel a finding that Plaintiffs will suffer irreparable harm in the absence of an injunction. The argument to the contrary, especially with no proof to back it up, is both remote and speculative. Further, the loss of some economic advantage is contemplated by Section 55-c, and, presumably, will be compensated if the Molson line is discontinued for Plaintiffs and compensation awarded. See ABC Law § 55-c(7)(a) and (2)(i).[8]

The Court concludes that Plaintiffs have not established that they will suffer irreparable harm in the absence of an injunction. Therefore, the motion for a preliminary injunction is denied.

### d. Cross-Motion to Stay Proceedings Pending Arbitration

Next, the Court turns to Defendant's cross-motion to stay the instant proceedings

---

[7] In Jacobson & Co., Inc., the plaintiff was "a contractor in the business of furnishing and installing acoustical ceiling tile and systems, partitions, and other interior assemblies." 416 F. Supp. at 565-66. Defendant was the leading supplier of acoustical tiles in the industry. Id. With regard to the plaintiff's loss of the defendant's product line of acoustic ceiling tiles, the District Court wrote:

> While there appear to be adequate substitutes for many although not all Armstrong products, there is no doubt that Armstrong is the leader in the industry and that its products are often required in architect's specifications. Almost all of Jacobson's major competitors are Armstrong distributors, and Jacobson's purchases from Armstrong far exceed those from other manufacturers. Accordingly, it is likely that Jacobson will be placed at some competitive disadvantage in bidding jobs if Armstrong's refusal to deal with it continues.

Jacobson & Co., Inc., 416 F. Supp. at 569-570.

[8] Indeed, if the mere allegation that a multi-brand distributor would suffer a loss of good will and, therefore, irreparable harm, is enough to impose the drastic remedy of a preliminary injunction, it would stand to reason that a brewer could never implement a consolidation plan as contemplated by New York ABC Law Section 55-c if objected to by a distributor.

13

pending arbitration.  Implicit in this motion is the representation that Defendant will seek to arbitrate all underlying issues.

Section 3 of the Federal Arbitration Act ("FAA") provides that upon being satisfied that the issues involved in a suit are "referable to arbitration under an agreement in writing for such arbitration", the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

There is no dispute that Finger Lakes signed the Molson Amendment to its distributorship agreement.  See Vasile Aff. ¶ 10 & Ex. B.  The Molson Amendment provides, in pertinent part at paragraph 6.2,  that any and all disputes between Coors and plaintiff, "including without limitation a dispute as to whether the Company has grounds to terminate [the distributorship] Agreement," would be resolved by arbitration before the American Arbitration Association in accordance with the AAA Commercial Arbitration Rules.  Further, there is no dispute that Doldo Brothers, Inc. signed the Molson Agreement.  Doldo Aff. ¶ 11 & Ex. C.  The Molson Agreement contains, at paragraph 11.2, dispute resolution language identical to that found in the Molson Amendment.

The Federal Arbitration Act establishes a "federal policy favoring arbitration agreements," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), and mandates the enforcement of contractual arbitration provisions. The FAA provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.    Challenges to the validity of a contract requiring arbitration of disputes "should . . . be considered by an arbitrator, not a court." Buckeye Check Cashing, Inc. v.

14

Cardegna, 546 U.S. 440, 446 (2006).

The Court recognizes that there are grounds to challenge the enforcement of the arbitration provisions in issue here.  However, for the reasons stated by Judge Stanton of the Southern District last week in Spirit & Sanzone Dist. Co., Inc. v. Coors Brewing Company, 08-civ-0251 (S.D.N.Y. Feb. 28, 2008), and for the reasons stated by Judge Garaufis of the Eastern District in John G. Ryan, Inc. v. Molson USA, LLC, 2005 WL 2977767 (E.D.N.Y. Nov. 7, 2005), which reasons this Court adopts, the Court finds no grounds arising from New York ABC Law ¶ 55-c, the Dormant Commerce Clause, or the Twenty-first Amendment that prevent the instant disputes from being arbitrated.  As Judge Stanton pointed out, the Supreme Court held last month that "[t]he FAA's displacement of conflicting state law is now well established, and has been repeatedly reaffirmed." Preston v. Ferrer, — U.S. —, ----, 128 S. Ct. 978, 979 (2008).   "When parties agree to arbitrate all questions arising under a contract, the FAA supersedes state laws lodging primary jurisdiction in another forum, whether judicial or administrative."  Preston, 128 S. Ct. at 987.

Further, the Court finds no reason in the Webb-Kenyon Act, 27 U.S.C. §122(a), or the Twenty-first Amendment Enforcement Act, 27 U.S.C. § 122(a), that would override the parties' agreement to arbitrate or that would supersede the clearly established federal policy in favor of enforcing those agreements.  There is no indication in either of these acts that Congress intended to override the federal policy in favor of enforcing arbitration agreements between private parties.

Finally, the Court finds no reason arising from the other terms of the parties' agreements that would compel a contrary conclusion. By designating a forum for disputes

that are not brought to arbitration, or by designating a choice of law for all disputes under the agreements, the parties have not expressed a clear intent to vitiate the arbitration clause of their agreements.  The argument is illogical as it would lead to a complete expungement of the arbitration provisions, "a result forbidden by canons of construction." Bank Julius Baer & Co., Ltd. v. Waxfield Ltd., 424 F.3d 278, 283 (2d Cir. 2005).   Further, under Second Circuit case law

> if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it: "[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation marks omitted). Moreover, we "cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration." Personal Sec. & Safety Systems v. Motorola, 297 F.3d 388, 396 n. 11 (5th Cir. 2002).

Id., at 284.  None of the other provisions cited by Plaintiffs specifically precludes arbitration.

The issues being raised in this matter are arbitrable. See id., at 281-82;[9] Spirit & Sanzone Dist. Co., Inc. v. Coors Brewing Company, 08-civ-0251, pp. 4-5 ("In addition, a clause referring 'any and all' controversies to arbitration is 'inclusive, categorical, unconditional and unlimited' and it is a 'broad grant of power to the arbitrators' which

---

[9] The Second Circuit stated in Bank Julius Baer & Co., Ltd.,

> In deciding whether a dispute is arbitrable, we must answer two questions: (1) "whether the parties agreed to arbitrate," and, if so, (2) "whether the scope of [that] agreement encompasses the claims" at issue. Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 666 (2d Cir. 1997). Consistent with the strong federal policy in favor of arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed.2d 765 (1983).

424 F.3d at 281-82.  In the instant case, doubts on these two points, if any, are resolved in favor of arbitration.

16

shows 'that the parties intended to arbitrate issues of arbitrability.'")(quoting PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199-1200 (2d Cir. 1996)).  Thus, under FAA Section 3, the Court must stay proceedings pending arbitration. See Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987)(Under 9 U.S.C. § 3, the court has a duty to stay these proceedings if it is satisfied that the issue before it is arbitrable, and "[t]his duty ... is not diminished when a party bound by an agreement raises a claim founded on statutory rights." ).  Therefore, Defendant's cross-motion to stay the instant proceedings pending arbitration is granted.  If arbitration proceedings are not initiated with regard to both Plaintiffs within fourteen (14) days of the date of this Decision and Order, Plaintiffs may apply to vacate the stay order.

### e. Cross-Motion to Deposit Money with Court Pursuant to Rule 67

Defendant also moves to deposit $1,291,000.00 into the Court pursuant to Fed. R. Civ. P. 67(a) for what it believes will ultimately be the compensation that it be required to pay Plaintiffs for terminating their exclusive territorial Molson distribution rights. Plaintiffs respond that they "are not concerned that Coors will not pay Plaintiffs if Coors is permitted by this Court to terminate them.  Thus, a deposit under Rule 67 is not warranted in this instance."  Plf. Reply Mem. L. p. 3.

Given Plaintiffs' position, the Court finds no reason for a Rule 67(a) deposit in this matter.  See John v. Sotheby's. Inc., 141 F.R.D. 29, 34 (S.D.N.Y. 1992)(The goal of Rule 67 is to provide a safe place for an asset and relieve a depositor of the burden of administering an asset.  It is generally utilized when the title to the asset is in dispute, not when liability is being disputed.).  Therefore, the cross-motion in this regard is denied.

### IV.     CONCLUSION

For the reasons discussed above, Plaintiffs' motion for a preliminary injunction [dkt. # 6] is **DENIED.**   Defendant's cross-motion to (a) deposit $ 1,291,000 into the Court pursuant to Fed. R. Civ. P. 67(a); and (b)  stay litigation pending arbitration [dkt. # 10] is **GRANTED IN PART AND DENIED IN PART**.   The motion is **GRANTED** inasmuch as the present action is **STAYED PENDING ARBITRATION**.  If arbitration proceedings are not initiated with regard to both Plaintiffs within fourteen (14) days of the date of this Decision and Order, Plaintiffs may apply to vacate the stay order.  During the stay, Defendant shall submit to the Court a status report every ninety (90) days apprising the Court of the status of the arbitrations.  The motion is **DENIED** as to the request to deposit $1,291,000 into the Court pursuant to Fed. R. Civ. P. 67(a).

**IT IS SO ORDERED**

DATED:March 7, 2008

_____
Thomas J. McAvoy
Senior, U.S. District Judge